**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

BRUCE MERRICK, ET AL.

                              Plaintiffs,

v.

DIAGEO AMERICAS SUPPLY, INC.

                              Defendant.

CIVIL ACTION NO.
3:12CV-334-TBR-DW

---

**DEFENDANT DIAGEO AMERICAS SUPPLY, INC.'S OPPOSITION TO**
**PLAINTIFFS' MOTION TO FILE SECOND AMENDED COMPLAINT**

Defendant Diageo Americas Supply, Inc. ("Diageo") opposes Plaintiffs' motion to amend because (1) the new class allegations in the proposed second amended complaint ("SAC") are facially deficient under Federal Rule of Civil Procedure 23; and (2) the newly proposed plaintiff in the SAC lacks standing. Accordingly, the amendments in the SAC are futile.

**I.     Introduction**

Plaintiffs' attempt to define a class covering ***19 square miles*** and over ***20,000 properties*** fails as a matter of law and common sense. The crux of Plaintiffs' case is that ethanol emitted from Diageo's whiskey aging facilities causes a certain black mold—"Baudoinia"—to grow on their properties. However, as Plaintiffs' ***own*** allegations and ***own*** expert testing show, there is no way to resolve whether any Baudoinia is on a property—much less enough to constitute a nuisance—without doing a property-by-property assessment. That is fatal under Rule 23. *See,*

*e.g., Powell v. Tosh*, Civ. A. No. 5:09-CV-00121, 2013 WL 4418531, at *10 (W.D. Ky. Aug. 2, 2013) (holding that commonality, typicality, and predominance were lacking where a property-by-property analysis was required to determine whether there was a nuisance to surrounding homeowners).

Moreover, Plaintiffs face an insurmountable "multiple source" barrier to class certification. Plaintiffs themselves allege that ethanol emissions from two other whiskey producers—Brown-Forman and Heaven Hill—are causing the ***very same black mold*** (Baudoinia) to grow on their properties. And the proposed class area includes "Rubbertown"— an area with industrial operations that have been the subject of allegations of blackening and similar property damage. As this Court explained in rejecting class certification in a Rubbertown "fallout" case, "the presence of multiple industrial facilities in the vicinity strongly suggests that no single proximate cause equally applies to each potential class member." *Cochran v. Oxy Vinyls LP*, Civ. A. No. 3:06CV-364-H, 2008 WL 4146383, at *9 (W.D. Ky. Sept. 2, 2008) (internal citation and quotation marks omitted). Here, too, the presence of multiple nearby whiskey producers and an adjacent area of heavy industry means that causation only can be determined individually, and that no class member's claim will be typical—defeating class certification.

In addition to the facially deficient class allegations, the SAC purports to add as a named plaintiff Dant Growth, LLC ("Dant Growth"). Dant Growth is seeking damages related to alleged Baudoinia growth on a building located at 1163 Algonquin Parkway. But that building is not within the area where Diageo's ethanol emissions allegedly promote Baudoinia growth—the so-called "Zone of Exposure." As a result, Dant Growth has no standing, and Plaintiffs' attempt to add this entity into this case is futile.

## II.     Background

Since 1935, Diageo and its predecessors have been aging whiskey at the "Stitzel-Weller" facility at 3860 Fitzgerald Road in Louisville.  In addition, from 2008 to 2015, Diageo aged whiskey at the "Philmore" facility at 2346 Millers Lane.  SAC ¶¶ 65-75.  As part of the natural aging process, ethanol is emitted from wooden barrels at these facilities.  SAC ¶ 21.  Plaintiffs allege that ethanol vapors from Diageo's aging facilities cause Baudoinia to form on their properties.  SAC ¶¶ 2-3.  Baudoinia allegedly "appears as a black stain, black dots, and soot." SAC ¶ 56.  Plaintiffs claim damages in the form of cleaning costs and diminution in property value, and seek an injunction prohibiting Diageo's ethanol emissions.  SAC ¶¶ 3, 142.

### A.     Amended Class Allegations

Four years into this litigation, and after two prior complaints, Plaintiffs seek to define a class area by reference to where ethanol emissions from Diageo's facilities allegedly disperse— the so-called "Zone of Exposure."  SAC ¶ 109 and Exhibit B (Exhibit A to this Opposition). Specifically, Plaintiffs allege that Diageo's "ethanol emissions travel in the ambient air beyond the boundaries of the Defendant's facilities into the 'Zone of Exposure,' as determined on the map attached hereto as Exhibit 'B,' which is that geographic area in Jefferson County wherein the level of ethanol in the ambient air originating from the Defendant's Louisville facilities has reached a level of ethanol sufficient to promote the germination and colonization of whiskey fungus."  SAC ¶ 23.  They then define the class to include "owners of residential and commercial property and lessees of commercial property" within this "Zone of Exposure."  SAC ¶ 109(a). Incredibly, this class area (or "Zone of Exposure") extends miles from Diageo's facilities; indeed, it covers more than ***19 square miles*** and ***20,000 properties*** in Shively and surrounding areas.  *See* SAC Exhibit B.

Two aspects of this massive class demonstrate its futility. *First*, Plaintiffs' own allegations and expert sampling show that establishing the presence and amount of Baudoinia requires individual assessments of each property within the class area. Most importantly, Plaintiffs do ***not*** allege that Baudoinia can be found on each property within the ethanol "Zone of Exposure." To the contrary, they merely allege that Baudoinia "can be found on, and is present on, ***most*** property located ***near*** Diageo's warehouses." SAC ¶ 77 (emphasis added). In other words, even Plaintiffs do not believe that Baudoinia is present on all properties "near" Diageo's warehouses. Plaintiffs allege nothing about the presence of Baudoinia on properties that are "far" from Diageo's warehouses, yet are nevertheless within the massive Zone of Exposure.

This is not surprising in light of the testing results of Plaintiffs' own expert, Dr. James Scott. *See* Exhibit B (May 8, 2015 Report). Dr. Scott tested blackening at 14 places within the Zone of Exposure. *See id.* (demarking with a "*" the 14 locations within the class area tested by Dr. Scott). His results show that:

- Baudoinia was not detected in over 20% of the samples taken within the class area.

- At 1410 McCoy Avenue, which is owned by a named Plaintiff (SAC ¶ 17), only one of three samples tested positive for Baudoinia, demonstrating that most of the blackening at this property is not caused by Baudoinia.

Even for those samples which tested positive for Baudoinia, the test results do not attempt to quantify the amount of Baudoinia in comparison to other molds or blackening agents.

As these results and Plaintiffs' own allegations demonstrate, the presence of Baudoinia cannot be assumed throughout the "Zone of Exposure." Instead, only a property-by-property analysis can determine whether Baudoinia is present and, if so, the amount of Baudoinia relative to other forms of blackening.

*Second*, the class area covers an area of Louisville into which multiple whiskey producers emit ethanol—the alleged "trigger" for Baudoinia growth. SAC ¶¶ 77, 109, Exhibit B. Most notably, Brown-Forman and Heaven Hill also emit ethanol into the class area as part of their whiskey aging operations.[1] In fact, the **same Plaintiffs** in this case have sued Brown-Forman and Heaven Hill in Kentucky state court for the **same blackening** on their properties. *See* Complaint, *Bruce Merrick v. Brown-Forman Corp.*, No. 12-CI-03382 (Jefferson Cir. Ct.) (Exhibit C). In that case, Plaintiffs allege—like they do here—that ethanol emissions from Brown-Forman and Heaven Hill's aging facilities cause Baudoinia to grow on their properties and those in surrounding neighborhoods. *See, e.g., id.* ¶¶ 1-2, 24-25.[2] Indeed, as the below map of the "Zone of Exposure" shows, named Plaintiffs Allen/Billy and Dant Growth—and many putative class members—are much closer to Brown-Forman and/or Heaven Hill than either of Diageo's facilities.[3]

---

[1] In addition to other whiskey producers, several industrial companies operate facilities in and around the class area that emit ethanol. For example, Marathon Petroleum Company operates a nearby gasoline terminal that is permitted to handle up to 130 million gallons per year of ethanol. *See, e.g.*, Marathon Petroleum Company, LLC Title V Operating Permit at 87-89 (April 15, 2009) (Exhibit D); Marathon Petroleum Company, LLC Title V Statement of Basis at 30 (Dec. 1, 2008) (Exhibit E).

[2] Initially, Plaintiffs sued all three distillers—Diageo, Brown-Forman, and Heaven Hill—in this Court in a case captioned *Billy v. Diageo Americas Supply, Inc.*, Case No. 3:12-cv-00284-CRS. Plaintiffs, however, dismissed that lawsuit without prejudice and filed two separate actions: the current case against Diageo in this Court, and a case in state court against Brown-Forman and Heaven Hill. The state-court case is pending before the Kentucky Supreme Court on the question of whether the plaintiffs' common-law claims are preempted.

[3] Plaintiffs allege that Bruce Merrick owns the property located at 1500-1600 Bernheim Lane and Dant Growth owns the real property at 1163 Algonquin Parkway. SAC ¶¶ 11, 13. Plaintiffs allege that Dant Clayton Corporation operates a commercial business at 1500-1600 Bernheim Lane and 1163 Algonquin Parkway. SAC ¶ 12. These locations are identified as "Merrick" and "Dant Growth," respectively, on the map below.



Moreover, there are other types of blackening in the putative class area, including naturally growing molds that are ubiquitous in Kentucky. In addition, a substantial portion of the class area repeatedly has been the subject of "fallout" claims against industrial operations in Rubbertown. Like in this case, where Plaintiffs allege that Diageo has caused a substance "appear[ing] as a black stain, black dots, and soot" to accumulate on their properties, SAC ¶ 56, the plaintiffs in these other cases also have alleged blackening and other property damage caused by these industrial sources. *See, e.g., Burkhead v. Louisville Gas & Elec. Co.*, 250 F.R.D. 287, 289 (W.D. Ky. 2008) (fallout described as "black ash, grey ash, black dust, black grit, black soot, sticky black material, white dust, white ash, white powder, yellow-green powdery substance, an

oily film, or a syrupy or brine-like substance"); *Cochran,* 2008 WL 4146383, at *1 (fallout described as "black soot, white dust, white ash, white powder, and a green-yellow substance").[4] Indeed, in another putative class action currently pending in this Court, plaintiffs allege that residents within four miles of LG&E's Cane Run site—a geographic area that substantially overlaps with the "Zone of Exposure"—have been subjected to "coal dust, fly ash, bottom ash, and other coal combustion byproducts" from LG&E's operations. *See* Complaint, *Little v. Louisville Gas & Elec. Co.*, Case No. 3:13-CV-1214-JHM, ¶¶ 11, 83, 84 (filed Dec. 16, 2013).

**B.     New Plaintiff: Dant Growth**

In addition to amending their class allegations, the SAC purports to add Dant Growth, which "at all times material hereto owned commercial real property and improvements located at 1163 Algonquin Parkway, Louisville, Kentucky." SAC ¶ 13. Plaintiff Dant Clayton Corporation allegedly operates a business at this property. *Id.* ¶ 12 ("Dant Clayton Corporation . . . operates commercial businesses at 1500-1600 Bernheim Lane and 1163 Algonquin Parkway . . . .").

Before filing their motion to amend and the proposed second amended complaint, Plaintiffs sent a draft complaint to counsel for Diageo. *See* Ex. F. The boundary of the Zone of Exposure in that draft was approximately 1/3 mile west of the Algonquin Parkway property. In the SAC attached to Plaintiffs' motion to amend, Plaintiffs moved the line east, presumably to include the commercial building owned by Dant Growth at Algonquin Parkway, which allegedly

---

[4] Specifically, "fallout" cases have been brought against Hexion (Case No. 3:06-CV-276-H), Louisville Gas & Electric Co. ("LG&E") (Case No. 3:06-CV-282-H), Oxy Vinyls Services, Inc. (Case No. 3:06CV-364-H), Zeon Chemicals L.P. (Case No. 3:06-CV-00363-H), Rohm & Haas Co. (Case No. 3:06-CV-575-H), American Synthetic Rubber Co. (Case No. 3:06-CV-00422-H), and Dupont Dow Elastomers (Case No. 3:07-CV-00581-H).

has been damaged by Baudoinia.[5]  But they did not move it far enough because the building is still outside the Zone of Exposure.  *See infra* at 24-25.  In other words, their attempt at gerrymandering failed.[6]

### III.  Standard

A motion to amend should be denied when the amendment would be futile.  *Yuhasz v. Brush Wellman, Inc.,* 341 F.3d 559, 569 (6th Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  With respect to class allegations, "[l]eave to amend the scope of the class is inappropriate . . . if the amendment would be futile and would not result in class certification." *In re Porter*, 295 B.R. 529, 542 (Bankr. E.D. Pa. 2003) (collecting cases); *see also Presser v. Key Food Stores Coop., Inc.*, 218 F.R.D. 53, 56 (E.D.N.Y. 2003) ("If Plaintiffs' proposed class cannot be certified, leave to amend should be denied"); *Feldman v. Lifton*, 64 F.R.D. 539, 543 (S.D.N.Y. 1974) (amendment is futile in a class action where the proposed amendment would "violate class action requirements").

---

[5] As a point of reference, the eastern boundary line of the "Zone of Exposure" in the draft SAC bisected Churchill Downs.  The new "Zone of Exposure" includes all of Churchill Downs.

[6] Plaintiffs' gerrymandering is apparent from even a brief glance at the map of the "Zone of Exposure."  Plaintiffs purport to define the "Zone of Exposure" based on dispersion of ethanol vapors from Diageo's facilities, yet the "Zone" is characterized by straight lines and sharp angles in various places.  As common sense suggests, ethanol does not disperse in the air in neat lines or sharp angles, but instead disperses and drifts according to the wind.  Moreover, Plaintiffs' proposed boundaries include parts of houses, while excluding other parts of those same houses. *See* map *infra*, at 25.  For these reasons, too, Plaintiffs' class definition is facially implausible. *See Brockman v. Barton Brands, Ltd.,* Civ. A. No. 3:06-CV-332-H, 2007 WL 4162920, at *2 (W.D. Ky. Nov. 21, 2007) ("[C]ourts have rejected proposed classes where plaintiffs failed to identify any logical reason . . . for drawing the boundaries where they did.") (internal citation and quotation marks omitted).

**IV.     Argument**

 **A.     The proposed class allegations are futile and should be rejected.**

 To be certified, a class must first meet the requirements of Rule 23(a): "(1) the class must be so numerous that joinder of all members is impracticable ['numerosity']; (2) there must be questions of law or fact common to the class ['commonality']; (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class ['typicality']; and (4) the representative parties must fairly and adequately protect the interests of the class ['adequacy']." *Brockman v. Barton Brands, Ltd.*, Civ. A. No. 3:06CV–332–H, 2007 WL 4162920, at *2 (W.D. Ky. Nov. 21, 2007).

 In addition, "a purported class must meet at least one of the requirements of Rule 23(b)." *Id.* at *7. Here, Plaintiffs seek to certify a damages class under Rule 23(b)(3). Rule 23(b)(3) requires "predominance": that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Where there are individualized questions going to liability—particularly causation—common issues cannot predominate. *See, e.g.*, *Brockman*, 2007 WL 4162920, at *9 (finding predominance lacking where the "*cause* of the entire class's damages could [not] be determined on a classwide basis") (emphasis in original); *July v. Bd. of School Comm'rs*, 291 F.R.D. 653, 661 (S.D. Ala. 2013) ("when there are significant individualized questions going to liability . . . the need for individualized assessments of damages is enough to preclude 23(b)(3) certification") (internal citation and quotation marks omitted); *Blake v. Chemlawn Servs. Corp.*, Civ. A. No. 86-3413, 1988 WL 6151, at *4 (E.D. Pa. Jan 26, 1988) (denying class certification in part because plaintiffs faced "highly individualized causation issues").

Plaintiffs also seek an injunctive relief class under Rule 23(b)(2). A Rule 23(b)(2) class must be cohesive; indeed, the "defining characteristic" of a Rule 23(b)(2) class is "homogeneity of the interests of the members of the class." *Romberio v. Unumprovident Corp.,* 385 F. App'x 423, 432-33 (6th Cir. 2009). As with predominance, where "individualized determinations are necessary, the homogeneity needed to protect the interests of absent class members is lacking." *Id.* at 433.

1.    **Class certification is inappropriate because property-by-property inquiries are required into the presence and quantity of Baudoinia.**

The central allegation in this case is that Diageo's ethanol emissions caused Baudoinia "accumulation" on class members' properties, creating a nuisance. SAC ¶¶ 130-31, 147-48, 159. Under Kentucky law, a nuisance exists "if and only if a defendant's use of property causes unreasonable and substantial annoyance to the occupants of the claimant's property or unreasonably interferes with the use and enjoyment of such property, and thereby causes the fair market value of the claimant's property to be materially reduced." KRS §§ 411.530, 411.540; *see also Brockman v. Barton Brands*, Civ. A. No. 3:06CV–332–H, 2009 WL 4252914, at *3 (W.D. Ky. Nov. 25, 2009).[7] Thus, in order to establish the basic elements of causation and injury in this case, a plaintiff would have to show at least: (1) that Baudoinia exists on a property; and (2) that the Baudoinia exists in such quantities that it has become an "unreasonable and substantial" annoyance or interference with use—particularly in light of other blackening

---

[7] Similar to nuisance, "unreasonable interference with the property owner's possessory *use* of his/her property is sufficient evidence of an actual injury (or damage to the property) to award actual damages" in a trespass claim. *Smith v. Carbide & Chems. Corp.*, 226 S.W.3d 52, 57 (Ky. 2007) (emphasis in original); *see also Cochran,* 2008 WL 4146383, at *6 (rejecting class certification in a Rubbertown "fallout" case alleging nuisance and trespass because of individualized issues related to causation and damages).

agents and contaminants (*e.g.*, molds, soot, dust) that are ubiquitous within the class area.[8]  Both of these questions require an individualized analysis of each of the more than 20,000 properties within the class area.

As a threshold matter, property-by-property analysis is required to determine which of the 20,000+ properties have **any** Baudoinia on them (putting aside whether Diageo caused that Baudoinia growth, *see infra* at 16-20).  Plaintiffs' own proposed complaint recognizes there are properties within the class area on which there is no Baudoinia.  *See* SAC ¶ 77 ("Due to the nature of *Baudoinia*, it can be found on, and is present on, **most** property located **near** the Diageo warehouses . . .") (emphasis added).  And the sampling results of Dr. Scott, their expert, refute any notion that Baudoinia necessarily will be present on all properties within the "Zone of Exposure."  *See* Exhibit B.

At bottom, Plaintiffs' proposed class is based on a sleight of hand.  It is designed around a criterion (exposure to ethanol) that **might** produce the harm that they claim (the accumulation of Baudoinia on their property).  However, that is legally deficient:  "The relevant question . . . is not whether [the substance at issue] has the capacity to cause harm, the generic causation issue, but whether it **did** cause harm and to whom.  That determination is highly individualistic . . . ."

---

[8] The SAC demonstrates that these questions are fundamental to all of Plaintiffs' theories.  *See* SAC ¶¶ 130, 131 (temporary nuisance) ("The accumulation of whiskey fungus . . . unreasonably interferes with private use and enjoyment of Plaintiffs' property and the property of those similarly situated such that it causes unreasonable and substantial annoyance to the occupants of the property" and "causes the value of use or the rental value of the property to be reduced"); *id.* ¶¶ 147-48  (permanent nuisance) (accord); *id.* ¶ 159 (trespass) (Plaintiffs and class members have been "damaged by the accumulation of whiskey fungus which causes damage to the property . . . causes unreasonable and substantial annoyance and unreasonable interference with the use and enjoyment of the property, and, as a result of which, the value, value of use and/or the rental value of the property has been reduced").

*In re Agent Orange Prod. Liability Litig.*, 818 F.2d 145, 165 (2d Cir. 1987) (emphasis in original).

Indeed, this Court specifically has rejected the notion that class certification is appropriate where "the substances emitted by Defendant's plant ***could conceivably*** result in the problems of which Plaintiffs complain." *Brockman*, 2007 WL 4162920, at *4 n.3 (emphasis added). While that might establish "general causation," it does not "show or even intimate that specific causation (and therefore Defendant's liability) might be determined on a classwide basis." *Id.* Here, too, even if it is conceivable that ethanol emitted by Diageo could cause Baudoinia growth on the thousands of properties within the class area, whether it did so is an individualized, property-by-property question.[9]

Moreover, the presence of Baudoinia is only the beginning—not the end—of the liability inquiry as to Diageo. Each class member also would have to show that the ***quantity*** of Baudoinia on her residence—when viewed in light of blackening caused by other mechanisms or other ethanol sources besides Diageo—created a nuisance. And if there is only a trace of Baudoinia caused by Diageo located in one area of a property—and other blackening agents (*e.g.,* mold, soot, soiling, etc.) are found throughout—there is no basis on which to hold Diageo liable for the damages sought by Plaintiffs. *See Reynolds v. Cmty. Fuel Co.*, 218 S.W.2d 950, 952 (Ky. 1949) ("[A] trifling annoyance and inconvenience does not constitute an actionable nuisance . . . .") (internal citation omitted). And, critical for class certification, there is no way to

---

[9]  In particular, a sampling of each property would be required to determine the presence of Baudoinia. As this Court explained in *Cochran,* a single sample "shows little if anything about the condition of any property other than that on which the sample was collected." 2008 WL 4146383, at *6. It "would be at best irresponsibly speculative for the Court to extrapolate from a solitary dust sample the idea that property belonging to tens of thousands of other individuals was so similarly affected as to recommend adjudication of this case as a class action." *Id.*

quantify the amount of Baudoinia versus other molds and blackening agents without a property-by-property analysis.

This Court's decertification decision in *Powell v. Tosh* is instructive. *See* 2013 WL 4418531. There, property owners brought a nuisance claim based on odors from a neighboring hog farm. *Id.* The Court found that key elements of the case were not susceptible to common, classwide resolution. *Id.* at *5-6. *First*, the **subjective element** of the nuisance claim—whether the odors caused "substantial annoyance" or interfered with the "use and enjoyment of property"—required individual inquiries. *Id.* Many putative class members either could not smell the hog odors or the odors were "minimal and not substantially annoying," demonstrating this element could not be resolved classwide. *Id.* at *5.

*Second*, the **objective element** of a nuisance claim—whether any annoyance or interference was "unreasonable"—also required individual inquiries. *Id.* at *7-8. The Court explained that Kentucky law sets forth seven factors for determining whether a particular use of property constitutes a nuisance, two of which "focus specifically on the circumstances of the individual claimant and, thus, necessarily require individualized proof." *Id.* at *8.[10] Those two factors are the "kind, volume, and duration of the annoyance or interference" and "the respective situations of the defendant and claimant." *Id.* (discussing Ky. Rev. Stat. §§ 411.550(1)(e), (f)). Because the "intensity and duration (or lack thereof) of the hog odor" varied among class members—and the class members were differently situated with respect to the barns in question—"it would be impossible for a jury to consider these factors on a classwide basis." *Id.*

---

[10] The Court also explained that the pattern jury instructions on nuisance "do not address the scenario of a **class** of plaintiffs." *Powell*, 2013 WL 4418531, at *8 (emphasis in original). Nor do they "contemplate a single, collective answer to liability; instead, they expressly state that a jury must 'render a separate verdict for each [plaintiff]' and 'award to each' a particular damage award." *Id.* (quoting Palmore, *Kentucky Instructions to Juries* § 48.02, ¶ 3)).

Like the unharmed class members in *Powell*, there are properties within the proposed class area that have no Baudoinia on them. Plaintiffs' own allegations and testing results show that fact. Moreover, there is no way for Plaintiffs to show the "intensity and duration" of Baudoinia growth on 20,000+ homes on a classwide basis. This is particularly true since, like the class members in *Powell*, the thousands of individual class members are differently situated with respect to Diageo's facilities—with some miles away and adjacent to other sources of ethanol or other blackening agents. In short, both in *Powell* and in this case, "neither the question whether the class members subjectively claim to have suffered a substantial annoyance or interference, nor the question whether that annoyance or interference was objectively unreasonable, can be resolved 'in one stroke.'" *Id.* at *9 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (commonality requires the class' claims to be based on a common contention that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke")); *see also Mays v. Tennessee Valley Authority*, 274 F.R.D. 614, 625 (E.D. Tenn. 2011) (rejecting class certification in a case alleging dispersion of coal ash because "[t]here is no 'typical' proof for how coal ash came to be on each unique piece of property, no 'typical' proof for whether the coal ash affected or damaged each property, and no 'typical' proof for how each individual property owner used or enjoyed his or her property").

Courts in other jurisdictions also have refused to certify classes alleging dispersion of a harmful substance where, as here, a property-by-property inquiry is required. In *Ebert v. General Mills, Inc.*, 823 F.3d 472,475 (8th Cir. 2016), for example, the court reversed certification of a proposed class of residents near a facility that allegedly dispersed the chemical trichloroethylene ("TCE") into surrounding areas. The Court first explained that Rule 23(b)(3)'s

predominance requirement was not met because "there are individual issues that will predominate on the matters of liability and damages." *Id.* at 479. Similar to this case, these elements could only be determined through "a property-by-property assessment of additional upgradient (or other) sources of contamination, whether unique conditions and features of the property create the potential for vapor intrusion, whether (and to what extent) the groundwater beneath a property is contaminated, whether mitigation has occurred at the property, or whether each individual plaintiff acquired the property prior to or after the alleged diminution in value." *Id.* The court then held that plaintiffs' Rule 23(b)(2) class failed for the same reasons. Specifically, "disparate factual circumstances," including that "some tested properties evidenced the existence of TCE soil vapors at widely varying levels and some did not," prevented the class from being cohesive. *Id.* at 481.

Similarly, in *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273 (S.D. Ala. 2006), the district court rejected certification of a proposed class of residents within a 2.1 mile radius of a facility that allegedly dispersed hazardous chemicals. *Id.* at 294. The court reasoned:

> Any theory of liability predicated on intrusion of Ciba contaminants on a plaintiff's property (e.g., nuisance, trespass, negligence) finds common issues being overwhelmed by individual issues for four reasons, to-wit: (a) individual proof will be necessary to show the existence of contamination; (b) individual proof will be necessary to show the causation of any observed contamination; (c) individual proof will be necessary on the issue of damages; and (d) individual proof will be necessary to assess defendants' limitations defense.

*Id.* at 306-07.

Numerous other cases are in accord.[11] As in these cases, the Court should reject class certification here, too, because the existence and extent of any Baudoinia cannot be determined classwide.

## 2. Multiple sources of the same harm prohibit class certification.

Plaintiffs' proposed class fails for an additional reason: there are admittedly multiple sources of exactly the same harm allegedly caused by Diageo. As this Court repeatedly has held, that is an insurmountable barrier to certification under both Rule 23(a) and Rule 23(b).

For example, in *Cochran v. Oxy Vinyls LP*—a case concerning alleged "fallout" in the Rubbertown area—this Court rejected class certification because "the presence of multiple industrial facilities in the vicinity strongly suggests that 'no proximate cause equally applies to each potential class member and each defendant.'" *Id.* at *9 (citing *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988)); *see also id.* at *1 and n.1 (noting defendant's facility bordered "several industrial facilities in the Rubbertown area," including "Zeon Chemical LP, Lubrizol Advanced Materials, PolyOne Corporation, Carbide Industries, LLC, and

---

[11] *See LaBauve v. Olin Corp.*, 231 F.R.D. 632, 673 (S.D. Ala. 2005) (rejecting certification of a class of residents allegedly harmed by mercury contamination where a number of issues required individual resolution, including "[w]hether a plaintiff's property is contaminated, the source(s) of such contamination, the extent of such contamination, the cause and timing of harm, and the resulting damage . . . ."); *Ginardi v. Frontier Gas Servs., LLC*, No. 4:11-CV-00420-BRW, 2012 WL 1377052, at *1, *5 (E.D. Ark. Apr. 19, 2012) (holding the predominance requirement was not satisfied with respect to a class of persons within a one mile radius of a natural gas compressor and/or transmission station because "[e]ach class member would be required to present highly individualized evidence regarding damages and causation"); *Henry v. The Dow Chem. Co.*, No. 03-47775-NZ, 2011 WL 3269118, at *3 (Mich. Cir. Ct. July 18, 2011) ("Whether plaintiffs have suffered an interference with or loss of use and enjoyment of their property requires an individualized factual inquiry into each plaintiffs use and enjoyment of their property."); *Boring v. Medusa Portland Cement Co.*, 63 F.R.D. 78, 85 (M.D. Pa. 1974) (finding that predominance was not satisfied for claims based on dispersion of limestone dust because "the class members are geographically dispersed in such a fashion that it is unlikely that any large group suffered the same quantity of 'fall-out,'" such that "[l]iability cannot be established in a single mass proceeding").

a Metropolitan (Louisville) Sewer District Pumping Station"). Specifically, the Court explained that there were other sources in the area that could have caused the same harm, and the proposed class members were differently situated with respect to the various sources. *See id.* at *8 (explaining "multiple industrial facilities emit carbonized material within the proposed class boundary and . . . some of the proposed class members live closer to facilities other than Oxy Vinyls"). As a result, the "assurances inherent" in cases that have granted class certification— namely, that "the trespasses and nuisances alleged were the result of a ***single defendant's activities***"—were not present. *Id.* at *9 (emphasis added). Because of the inherently individualized inquiry dictated by multiple sources and differently situated class members, the Court rejected class certification due to a lack of typicality under Rule 23(a)(3) and a lack of predominance under Rule 23(b)(3).

For the same reasons, this Court rejected class certification in another fallout case targeting Louisville Gas & Electric Co.'s facility in the Rubbertown area, *Burkhead v. Louisville Gas & Elec. Co.*, 250 F.R.D. 287 (W.D. Ky. 2008). Once again, the Court emphasized the distinction between a "sole source" and "multiple source" case:

> Plaintiffs have alleged that Defendant's operations result in extensive emissions, but what remains missing is any evidence that the ***cause*** of the entire class's damages could be determined in a single proceeding. A comparison to *Olden* illustrates the problem: there the Sixth Circuit proceeded under the belief that the toxins emitted by the defendant were distinguishable from those emitted by "other industrial sources" nearby. *Olden [v. LaFarge Corp.*, 383 F.3d 495, 508 (6th Cir. 2004)].* That is, the Olden defendant's plant was assumed to be ***the sole source of any damage the class members suffered, so a causation determination as to one class member could be extrapolated to all and the defendant's tort liability could be adjudicated on a classwide basis***.

*Id.* at 299 (emphasis added). In light of the individualized causation issues, liability was not a common question, and a class action was not a superior method to adjudicating Plaintiffs' claims under Rule 23(b)(3). *Id.* at 299-300. Moreover, the named Plaintiffs' claims were not typical of

those throughout the class area under Rule 23(a)(3) because they lived in "areas subject to completely different influences, meaning that the factual and legal issues of other proposed class members' claims, or even claims by various subgroups of class members against [defendant] could differ dramatically from one . . . to the next." *Id.* at 295 (internal citation and quotation marks omitted); *see also Brockman*, 2007 WL 4162920, at *6 ("Since other class members' proximity to Defendant's facility or another facility will depend on their exact location within the proposed class area, the factual and legal issues of Defendant's liability as to each proposed class member likely could differ dramatically from one plaintiff to the next.") (internal citation and quotation marks omitted).

Both of these cases—*Cochran* and *Burkhead*—relied on another multiple source case, *Boring v. Medusa Portland Cement Co.*, 63 F.R.D. 78 (M.D. Pa. 1974). There, a plaintiff sued two cement producers, alleging that they caused limestone dust to disperse onto neighboring properties. *Id.* at 83. The court rejected class certification because the individualized inquiries raised by the multiple sources made any class unmanageable and common issues did not predominate. *Id.* at 84. The court reasoned:

> The air pollution involved is allegedly from **two** sources releasing similar compounds in such a fashion as to raise considerable evidentiary problems. Such problems of proof are greatly increased because each resident, motorist or business is in a different proximity to the plants than the other class members. In effect, **each** plaintiff would have to separately establish what mixture of pollution caused him damage depending on the wind, location of the factories, etc. It is inconceivable that a single ratio of pollution by the two defendants could apply uniformly throughout the class. The plaintiffs would have to individually establish the liability of each defendant, then the respective roles of the defendants vis-à-vis each other.

*Id.* (emphasis in original); *see also Reilly v. Gould Inc.*, 965 F. Supp. 588, 603-05 (M.D. Pa. 1997) ("Although it is well established that the Marjol Battery Plant dealt primarily in the reclamation of lead from spent batteries and that the manner in which this was achieved may

have caused the release of lead into the environment . . . there are other prevalent sources of lead emission" and, because "disparate facts indicate that we cannot apply a blanket analysis to all class members," individual inquiries predominate).

This case is a paradigmatic example of a multiple source case that is inappropriate for class certification. In order to establish liability in this case, Plaintiffs would have to show that *Diageo's* ethanol emissions caused Baudoinia to grow on their properties to such an extent that it has become a nuisance. *See, e.g.,* SAC ¶ 121 ("As a direct and proximate result of the *Defendant's* conduct, the property of the Plaintiffs and others similarly situated has been damaged by the accumulation of whiskey fungus . . . .") (emphasis added). However, there are other distillers in the area—including Brown-Forman and Heaven Hill—that are emitting the *same constituent* (i.e., ethanol) that allegedly triggers the *same* Baudoinia that is allegedly harming the *same* Plaintiffs and neighborhoods in the *same* way. There is no dispute about this: Plaintiffs have alleged as much in the SAC and in their complaint filed in the Jefferson Circuit Court action against Brown-Forman and Heaven Hill.[12] Moreover, the purported class area includes territory where multiple industrial sources in Rubbertown repeatedly have been alleged to cause similar blackening and other environmental damage. *Compare Burkhead*, 250 F.R.D. at 289 (fallout described as including "black ash, grey ash, black dust, black grit, black soot, sticky black material"); *Cochran*, 2008 WL 4146383, at *1 (fallout described as including "black soot"), *with* SAC ¶ 56 (Baudoinia "appears as a black stain, black dots, and soot").

---

[12] *Compare* SAC ¶ 57 (alleging "whiskey fungus [Baudoinia] germinates when exposed to [Diageo's] ethanol"); ¶¶ 80-94 (alleging that Baudoinia caused by Diageo's ethanol emissions has accumulated on the properties of named Plaintiffs, including Bruce Merrick, Dant Clayton Corporation, Arthur Milby, Rose and Samuel Johnson, Samantha Allen, and Joseph Billy); *with* Complaint, *Bruce Merrick v. Brown-Forman Corp.* (Exhibit C) ¶ 35 (alleging "whiskey fungus germinates when exposed to [Brown-Forman and Heaven Hill's] ethanol"); ¶¶ 46-60 (alleging that Baudoinia caused by Brown-Forman and Heaven Hill's ethanol emissions has accumulated on the properties of the same named Plaintiffs).

In addition, as the map on page 6 demonstrates, the proximity of each class member to each distillery or other industrial source of blackening varies widely across the class. For example, named plaintiffs Samantha G. Allen and Joseph M. Billy, who reside at 1410 McCoy Avenue, live closer to Brown-Forman than to either of Diageo's warehouse facilities. Any analysis of whether Diageo's ethanol emissions caused Baudoinia to grow and accumulate on their property is necessarily different than for a class member residing across the street from Diageo's warehouses. The named Plaintiffs also are concentrated in the north and east area of the 19-square-mile class area—far from the industrial sources of Rubbertown. Again, there can be no dispute that the causation analysis will vary significantly for those living adjacent to Rubbertown, as compared to those living miles away and across the street from one of the distilleries. *See Burkhead*, 250 F.R.D. at 295 (rejecting that the named plaintiffs' claims were typical of those of the class as a whole due to their "geographic concentration" and the fact that other "members of the proposed class appear to live in areas subject to completely different influences"); *Powell*, 2013 WL 4418531, at *10 ("[E]ven assuming any or all of the named Plaintiffs were to prove their claims, they would not, by virtue of the necessarily individualized inquiry required, prove the claim of any other named Plaintiff or class member.").

As described above, courts repeatedly have rejected class certification in multiple source cases—including in cases involving the same industrial area of Louisville at issue here. In this case, Plaintiffs themselves allege multiple sources of the same alleged harm. That is fatal under Rule 23(a) and (b).

      **3.**      **The injunctive relief class under Rule 23(b)(2) is barred because the Court cannot provide relief.**

The existence of multiple sources of ethanol emissions creates an additional problem with respect to Plaintiffs' proposed injunctive relief class: any injunction that this Court could enter

cannot provide relief to Plaintiffs or the putative class. Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). As the Supreme Court explained: "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would ***provide relief*** to each member of the class." *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2557 (emphasis added).

An injunction binds only the defendant—not third parties. Fed. R. Civ. P. 65(d)(2). As a result, in cases where other sources of contamination exist and those sources are not parties to the litigation, an injunction only against the defendant does not provide relief and an injunctive class therefore is not appropriate. *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 345-46 (S.D.N.Y. 2002).[13] That is the case here. Presumably for strategic reasons, the named Plaintiffs chose to pursue their claims against Diageo alone in this Court, despite the fact that two other distillers—Brown-Forman and Heaven Hill—are allegedly causing the same harm to Plaintiffs. Whatever their reasons for pursuing the distilleries separately, Plaintiffs must accept the consequences of that choice: that this Court cannot provide relief to the class members through an injunction barring Diageo's ethanol emissions.[14] Thus, an

---

[13] As *MTBE* explains, this is a problem "that a later contribution action cannot cure" because "equitable remedies may not be passed on to other alleged wrongdoers in the manner that damages can be passed on to joint tortfeasors or indemnitors by way of contribution or indemnification." *In re MTBE Prods. Liab. Litig.*, 209 F.R.D. at 346 n.38 (internal citation and quotation marks omitted). *MTBE* also rejected an injunctive relief class for another, independent reason: "individual issues rebut [the] presumption of cohesiveness" required by Rule 23(b)(2). *Id.* at 343; *see also id.* at 344 ("There are . . . differences in the level of contamination that the named plaintiffs allege, the source of the contamination, how the contamination affects each plaintiff, and the nature of relief that each will require."). For the reasons discussed above, *see supra* at 10-20, individual issues defeat the cohesion requirement here as well.

[14] Plaintiffs are clear that emissions from Brown-Forman and Heaven Hill are causing Baudoinia growth on their properties and giving rise to the same alleged nuisance—wholly apart from any

injunction is not appropriate, and Plaintiffs' request for an injunctive relief class under Rule 23(b)(2) is futile.

### 4. The Court should reject the class allegations now.

Federal Rule of Civil Procedure 23 requires a court to determine whether to certify a class "at an early practicable time." Fed. R. Civ. P. 23(c)(1)(A). Applying this mandate, courts consistently have found that class certification can be decided when there is sufficient information to determine whether the requirements of Rule 23 are met—regardless of whether discovery is complete or a class certification motion has been filed. *See Schilling v. Kenton Cty., Ky.*, Civ. A. No. 10–143–DLB, 2011 WL 293759, at *4 (E.D. Ky. Jan. 27, 2011) (dismissing class allegations "based solely on the allegations in the complaint"); *Trunzo v. Citi Mortg.*, No. 2:11-CV-01124, 2014 WL 1317577, at *5 (W.D. Pa. Mar. 31, 2014) (rejecting class allegations where discovery was not complete and the class certification motion had not been filed); *Semenko v. Wendy's Int'l, Inc.*, No. 2:12-CV-0836, 2013 WL 1568407, at *3 (W.D. Pa. Apr. 12, 2013) (rejecting class allegations in complaint where "[n]either [d]iscovery [n]or a [c]ertification [m]otion" was necessary to resolve whether the elements of Rule 23 were met); *see also Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 160 (1982) (explaining that "sometimes the [class] issues are plain enough from the pleadings . . .").

In fact, the Court has "an independent obligation to decide whether an action is properly brought as a class action, even where neither party moves for a ruling on class certification." *Perez v. Gov't of Virgin Islands*, 109 F.R.D. 384, 386 (D.V.I. 1986); *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011) ("Consistent with [Rule 23(c)(1)(A)'s] language, a court may deny class certification even before the plaintiff files a motion requesting certification. This

---

conduct by Diageo. *See supra* n.12 (discussing Complaint, *Bruce Merrick v. Brown-Forman Corp.* (Exhibit C) ¶¶ 35, 46-60).

is because a court has 'an independent obligation to decide whether an action brought on a class basis is to be so maintained even if neither of the parties moves for'" class certification) (quoting 7AA Charles Alan Wright, et al., Federal Practice & Procedure § 1785, at 360-61 (3d ed. 2005)). This obligation is rooted not only in Rule 23's language, but also in sound case management. The parties should not be forced to waste the time and expense of engaging in full-scale class certification briefing, expert reports, and expert depositions when, from the record, it is apparent class certification is inappropriate. For these reasons, courts often reject attempts to amend a complaint to add new class allegations where it is apparent that the new class allegations are futile. *See Pilgrim v. Universal Health Card, LLC*, No. 5:09CV879, 2010 WL 1254849, at *5 (N.D. Ohio March 25, 2010), *aff'd,* 660 F.3d 943 (6th Cir. 2011) (granting a motion to strike class allegations where "no amount of discovery . . . could remedy the problems identified by the Court"); *In re Porter,* 295 B.R. 529, 542 (Bankr. E.D. Pa. 2003) (collecting cases); *see also Presser v. Key Food Stores Coop., Inc.*, 218 F.R.D. 53, 56 (E.D.N.Y. 2003) ("If Plaintiffs' proposed class cannot be certified, leave to amend should be denied.").

Here, no amount of additional discovery can change the indisputable facts and legal deficiencies underlying Plaintiffs' class allegations. There is no reasonable dispute that:

(1) For liability, Plaintiffs must show that Baudoinia—the only mold allegedly caused by Diageo's ethanol emissions—is on each class member's property. Yet, as Plaintiffs' own allegations and testing show, only through an assessment of each property could the fact-finder determine whether Baudoinia is present.

(2) Liability hinges not just on the presence, but also the amount of Baudoinia (as compared to other common molds and blackening agents) found at the properties of each class member. Yet there is no possible way to quantify the amount of Baudoinia, versus other molds and blackening agents, on a classwide basis. Only a property-by-property assessment could resolve this quantification question.

(3) According to Plaintiffs' own allegations (and the very same Plaintiffs' participation in a nearly identical complaint against two different distillers), there are other sources of the

same harm—Baudoinia growth—and the class area includes multiple other industrial sources of blackening.

(4) This Court and others consistently have rejected class certification where, as here, a property-by-property assessment is required to determine liability, and there are multiple sources of the same harm allegedly caused by the defendant. *See, e.g., Powell*, 2013 WL 4418531, at *10; *Cochran*, 2008 WL 4146383, at *9; *Burkhead*, 250 F.R.D. at 299; *Brockman*, 2007 WL 4162920, at *6.

Consistent with Rule 23's mandate, and for the sake of efficiency, the Court should reject the futile class allegations now and order that this case proceed as an individual action.

## B. Proposed Plaintiff Dant Growth lacks standing.

Standing is a "threshold question" in every case. *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 516 (6th Cir. 1976) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). As a constitutional matter, standing "imports justiciability" and requires a plaintiff to "allege such a personal stake in the outcome of the controversy as to warrant his invocation of the federal court's jurisdiction." *Id.* at 516-17 (internal citations and quotation marks omitted). In addition, "[t]o have standing to sue as a class representative, it is essential that a plaintiff must be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974); *see also Senter*, 532 F.2d at 518 ("Of course, it is not sufficient that an aspiring class representative allege purely personal injury at the hands of the defendant, to have standing to sue on behalf of the class he must be a member of the class and suffer injury common to the class.").

Newly-added Plaintiff Dant Growth lacks standing. Plaintiffs allege that "Dant Growth, LLC is a Kentucky Limited Liability Company organized under the laws of the Commonwealth of Kentucky, which company at all times material hereto owned commercial real property and improvements located at 1163 Algonquin Parkway, Louisville, Kentucky." SAC ¶ 13. But, as

the following map shows, the building located at 1163 Algonquin Parkway is not within the alleged "Zone of Exposure"—the only area where Plaintiffs are alleging harm due to Diageo's emissions. *See* SAC ¶ 23 ("Zone of Exposure" is the area where Diageo released enough ethanol "to promote the germination and colonization of whiskey fungus.").



Because Dant Growth's allegedly blackened commercial building at 1163 Algonquin Parkway is outside the Zone of Exposure, Dant Growth lacks a "personal stake in the outcome" of this action and has no standing. *See Senter*, 532 F.2d at 516-17 (internal citation and quotation marks omitted).[15]

---

[15] As noted above, another Plaintiff—Dant Clayton Corporation—operates a commercial business at the Algonquin Parkway location. SAC ¶ 12. Because the building at this property is outside the "Zone of Exposure," Dant Clayton has no claim against Diageo with respect to this property either. Nevertheless, Diageo is not moving to dismiss Dant Clayton for lack of standing at this time because it also operates a commercial property on Bernheim Lane, which is within the "Zone of Exposure." *Id.*

## V.    Conclusion

For the reasons set forth herein, it is respectfully submitted that the new class allegations in the SAC are futile and that Dant Growth is not a proper plaintiff.  Therefore, the Court should deny the motion to amend.

**Dated:**  August 19, 2016

Respectfully submitted,

/s/ John S. Reed
John S. Reed
jreed@rwsvlaw.com
Rebecca A. Naser
rnaser@rwsvlaw.com
Brooks D. Kubik
bkubik@rwsvlaw.com
REED WEITKAMP SCHELL & VICE PLLC
500 West Jefferson Street, Suite 2400
Louisville, Kentucky 40202
Telephone:  (502) 589-1000
Facsimile: (502) 562-2200

Walfrido J. Martinez
wmartinez@hunton.com
HUNTON & WILLIAMS LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 309-1000
Facsimile: (212) 209-1100

William L. Wehrum
wwehrum@hunton.com
Ryan A. Shores
rshores@hunton.com
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201

*Counsel for Defendant Diageo Americas Supply, Inc.*